# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| A.W. and M.W., | ) | |
| | ) | Lead Case No. 3:20-cv-76 |
| *Plaintiffs*, | ) | |
| | ) | Member Case No. 3:21-cv-57 |
| v. | ) | |
| | ) | Judge Travis R. McDonough |
| LOUDON COUNTY SCHOOL | ) | |
| DISTRICT, | ) | Magistrate Judge Debra C. Poplin |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

---

## MEMORANDUM OPINION

---

Before the Court is Plaintiffs' motion for judgment on the administrative record (Doc. 102). For the following reasons, the motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND & FINDINGS OF FACT

Under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, schools receiving federal funding must provide children with disabilities a "free and appropriate public education" ("FAPE"). *Hupp v. Switz. of Ohio Loc. Sch. Dist.*, 912 F. Supp. 2d 572, 588 (S.D. Ohio 2012) (citing *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 565 (6th Cir. 2000)). To provide a FAPE, school districts subject to the IDEA must create an individualized education program ("IEP") for each child with a disability that is designed to meet the eligible student's unique needs. *Id.*; 20 U.S.C. § 1414(a)(5).

M.W. is a fifteen-year-old girl who has attended schools in Defendant Loudon County School District ("LCSD") since kindergarten. (Doc. 67-3, at 727.) M.W. has been diagnosed

with attention-deficit-hyperactivity disorder ("ADHD"), oppositional-defiance disorder ("ODD"), and intellectual disability. (*Id.* at 558.) In January 2013, when M.W. was in kindergarten, her IQ was evaluated using the General Intellectual Ability subtest of the Woodcock-Johnson IV Tests of Cognitive Abilities, and she received a score of 87. (*Id.* at 764.) By September 2016, M.W.'s IQ was again evaluated using the same test, but on this evaluation, she received a score of only 70. (*Id.* at 552.)

## A. Fifth Grade

M.W. began her fifth-grade year in fall 2017, and she attended North Middle School, a school within LCSD. (*Id.* at 727.) During her fifth-grade year, M.W. was eligible for special-education services pursuant to the IDEA under the classification "intellectual disability" and "otherwise health impaired." (*Id.*).

On September 27, 2017, several LCSD employees met for M.W.'s annual IEP review and to generate an IEP for her fifth-grade year ("Fifth-Grade IEP"). (*Id.* at 743.) A.W., M.W.'s mother, is listed as a participant in the September 27, 2017 IEP review, but she testified that she does not believe she attended this meeting. (*Id.*; Doc. 67-2, at 1114–15.) In a sworn affidavit, A.W. averred that, while she received the invitation to the September 27, 2017 IEP meeting initially, M.W.'s fifth-grade special-education teacher told A.W. that, due to "some kind of personal situation," there was not going to be an IEP meeting on September 27, 2017. (Doc. 67-2, at 385.) Nonetheless, an IEP for M.W. was created after the September 27, 2017 meeting. (Doc. 67-3, at 727–43.) The Fifth-Grade IEP includes descriptions and data of M.W.'s "present levels of performance" in six assessment areas: (1) academic readiness, (2) adaptive behavior, (3) fine motor, (4) gross motor, (5) pre-vocational, and (6) social/emotional behavior. (Doc. 67-3, at 729–32.) Based on the data presented under the "present levels of performance," the Fifth-

Grade IEP identifies M.W.'s areas of need, sets an annual goal for M.W. to meet in each area, lists the LCSD personnel/position responsible for meeting the need, lists "benchmarks/short-term instructional objectives," notes the anticipated beginning date for working toward the benchmarks, and specifies the methods of evaluation for each benchmark. (*Id.* at 733–36.)

The IEP team copied the annual goals for four out of M.W.'s five areas of need (all but fine motor) verbatim from her previous IEP, which was created in January 2017. (*Compare id.* at 733–36, *with id.* at 710–713.) On November 16, 2017, LCSD held another IEP meeting—less than two months after the September 27, 2017 meeting. (Doc. 97, at 37.) A.W. participated in the November 16, 2017 meeting. (Doc. 97, at 37–38.) The only difference between the IEP generated on November 16, 2017 ("Fifth-Grade IEP Addendum"), and the Fifth-Grade IEP is the specification of certain additional accommodations to be provided to M.W. in her classes. (*Id.* at 30–32.) The goals in the Fifth-Grade IEP Addendum are exactly the same as the goals in the Fifth-Grade IEP. (*Id.* at 26–29; Doc. 67-3, at 733–36.) Therefore, the academic readiness, social/emotional behavior, pre-vocational and adaptive-behavior goals in M.W.'s IEPs remained the same from January 2017, through all of M.W.'s fifth-grade year, and until September 2018— a period of twenty months. (Doc. 67-3, at 710–13, 733–36; Doc. 97, at 26–29.) The IEP progress reports for M.W.'s fifth-grade year indicate that M.W. did not meet any of her goals during this period, though she made progress. (Doc. 67-3, at 919–44.)

### B. Sixth Grade

During the 2018–2019 school year, M.W. was in the sixth grade and continued to attend North Middle School in LCSD. (*Id.* at 558.) The teacher assigned to provide M.W. with special-education services was Zachary Buchanan. (*Id.* at 577.)

On September 21, 2018, the IEP team once again met for M.W.'s annual IEP review. (*Id.*) A.W. was present for this meeting and was accompanied by an advocate, Jennifer Nagel. (*Id.*) The IEP generated at this meeting (the "Sixth-Grade IEP") follows the same structure as the Fifth-Grade IEP: it sets out present levels of performance, identifies areas of need, sets goals for each area, and includes details on how each goal will be measured. (*See id.* at 558–77.) The "present levels of performance" section of the Sixth-Grade IEP indicated that on September 13, 2018, LCSD administered the Woodcock-Johnson III Normative Update Tests of Achievement ("WJ-III NU Ach") subtest for Math Computation (Calculation) to M.W. (*Id.* at 561.) M.W.'s score on this subtest placed her at a grade equivalent of 1.9—meaning her math-calculation skills were equivalent to the expected skills of students in the ninth month of first grade. (*Id.*)

### i. *Special-Education Teacher*

The Sixth-Grade IEP specified that M.W. should continue to receive 240 minutes per day of services from a special-education teacher in a special-education setting. (*Id.* at 573–74.) Buchanan signed the Sixth-Grade IEP as the special-education teacher, leading A.W. to believe that he was properly licensed to teach special education. (*Id.* at 577.)

However, Buchanan was not licensed to teach special education at the time he taught M.W. (Doc. 67-2, at 549–53.) In Tennessee, a licensed teacher may obtain a provisional special-education endorsement by submitting a recommendation from a State Board-approved educator-preparation provider verifying the teacher's enrollment in a program of study for additional endorsement in special education and assuring that the teacher will be assigned a mentor who is endorsed in special education. Tenn. Comp. R. & Regs. 0520-02-03-.11. At the time LCSD Special-Education Supervisor Melanie Amburn interviewed and hired Buchanan to teach special education at North Middle School, he was licensed to teach kindergarten through

4

Case 3:20-cv-00076-TRM-DCP   Document 117   Filed 09/28/22   Page 4 of 32   PageID #: 7786

fifth grade in Tennessee and was enrolled in a master's degree program in special education at Tusculum University.  (Doc. 67-2, at 550–51.)  He advised Amburn that he was working on obtaining his provisional endorsement in special education.  (*Id.*)  Amburn assumed, because he was enrolled in an appropriate program of study for the additional endorsement, that Buchanan would complete the necessary steps once hired to obtain his provisional endorsement in special education, but she did not follow up with the Tennessee Department of Education ("TDOE") or with Buchanan to ensure that he obtained the endorsement.  (*Id.* at 552.)  It is undisputed that Buchanan failed to submit the required recommendation from Tusculum University, his educator-preparation provider, verifying his enrollment and assuring that he would be assigned a mentor.  (*Id.* at 549–53, 650–51.)  However, LCSD assigned Buchanan another teacher, Tracy Fritts, to mentor Buchanan.  (*Id.* at 628.)  In late February 2019, Buchanan resigned from his position with LCSD.  (*Id.* at 618–20.)  After Buchanan resigned, Lesly Brown replaced him as special-education teacher for M.W.'s classroom.  (*Id.* at 567.)  Brown is a certified special-education teacher and had served as a paraprofessional in M.W.'s classroom before she was promoted to full-time special-education teacher after Buchanan left.  (*Id.*)

### ii.    *Progress Monitoring*

The Sixth-Grade IEP also provided that M.W.'s math-calculation and math-problem-solving goals were to be measured by "data collection, work samples, and monthly progress monitoring."  (Doc. 67-3, at 566–67.)  Her reading-comprehension goal was to be measured by "data collection, teacher observation, and monthly progress monitoring."  (*Id.* at 567.)

AIMSweb tests, or "probes," are short, timed tests, which last from one to eight minutes at the sixth-grade level, depending on the subject area.  (Doc. 67-2, at 748–79.)  Buchanan and Brown administered these probes to M.W. as part of her goal monitoring during her sixth-grade

year.  (*Id.* at 1290–91.)  Sandy Stewart, another special-education teacher at North Middle

School, trained Buchanan and Brown to administer AIMSweb probes and instructed them to

perform them monthly.  (*Id.* at 984, 1247, 1253–54.)  Stewart also administered some of the

AIMSweb probes and other testing to M.W. to assist Buchanan and Brown.  (*Id.* at 701, 994.)

LCSD's education expert, Dr. John McCook, Ed.D., testified that "AIMSweb is not a diagnostic

instrument.  AIMSweb is an observational one piece of data that is one minute out of the 7,200

minutes that month that the child has instruction," and "typically . . . it would not be best practice

to use one piece of data to make a determination of progress monitoring."  (Doc. 67-3, at 330–

31.)  Stewart testified that LCSD had a policy requiring all students to be given AIMSweb

probes for their grade level every nine weeks.  (*Id.* at 2–3.)  However, LCSD administered some

AIMSweb probes at other grade levels to M.W. in subject areas where her abilities measured

below grade-level to allow LCSD to track her progress at the appropriate instructional level.  (*Id.*

at 1–3, 10–11.)

  The first IEP progress report for M.W.'s sixth-grade year stated that she had "shown

growth and mastered addition with the use of a number line" in math calculation.  (*Id.* at 947.)

The report indicated an annual goal status of "5," meaning the school anticipated M.W. would

meet the goal by the end of the year.  (*Id.*)  The IEP progress report for the second reporting

period stated that M.W. "has shown steady improvement and is more excited for math than the

last grading period," also indicating a goal status of "5."  (*Id.* at 950.)  The progress report for the

third reporting period stated M.W. "is making slow, but steady[,] progress," and still indicated a

goal status of "5."  (*Id.* at 953.)

  On March 27, 2019, LCSD once again administered the WJ-III NU Ach Math-

Calculation subtest to M.W.  (*Id.* at 678.)  At this administration of the test, she received a score

that placed her grade equivalent at "<K.2," meaning her math-calculation skills fell below a kindergarten level. (*Id.*) The progress report for the final reporting period, prepared on May 17, 2019, stated M.W. "is doing a good job applying her knowledge in addition and subtraction," and still indicated a goal status of "5," meaning her teacher believed she would complete her math-calculation goal by the end of the year. (*Id.* at 959.) M.W.'s results on the AIMSweb assessments in reading comprehension, math calculation, and math concepts were not included in the Sixth-Grade IEP progress reports shared with A.W. (*Id.* at 946–62.) None of the IEP progress reports included any AIMSweb or Woodock-Johnson test data. (*Id.*) Nevertheless, M.W.'s teachers opined in their comments on her Sixth-Grade IEP progress reports that she made progress on every goal and samples of her in-class work and assessments demonstrated progress. (*Id.* at 946–62, 993–1098.)

### iii. April IEP Review

On April 2, 2019, the IEP team met for another annual review and prepared a new IEP (the "Seventh-Grade IEP"). (*Id.* at 675.) The section of the Seventh-Grade IEP that described M.W.'s present level of performance in math calculation listed the "<K.2" grade equivalency from the results of the March WJ-III Nu Ach Math-Calculation test. (*Id.* at 677–78.) The narrative written in this section of the Seventh-Grade IEP states that M.W. "can add and subtract one digit numbers correctly and fluently when tasks are not timed. When the assessment is timed, [M.W.] writes down any number to get the task completed rather than actually trying to perform the calculation correctly." (*Id.* at 677.) Despite her regression on the WJ-III Nu Ach Math-Calculation test, M.W.'s math-calculation and math-problem-solving goals for the Seventh-Grade IEP remained substantively identical to the Sixth-Grade IEP. (*Compare id.* at

566–67, *with id.* 685–86 (same goals, but Sixth-Grade IEP requires ninety-percent accuracy on four of five trials while Seventh-Grade IEP requires eighty-percent accuracy of the same).)

A.W. was accompanied at the Seventh-Grade IEP meeting by an advocate who pointed out M.W.'s math-calculation score decreased and that some of the scores under her "present levels of performance" were the same as the previous year. (Doc. 67-2, at 772.) A.W. and the advocate therefore asked to see the data underlying M.W.'s scores in that section of the IEP, but Brown and Amburn informed A.W. that they did not have the data, because Buchanan took it with him when he resigned. (*Id.*) Eventually, LCSD "dug deeper" and did find results from AIMSweb probes given to M.W. during her sixth-grade year. (*Id.* at 992.)

### C.    Seventh Grade

During the 2019–2020 school year, M.W. attended seventh grade at Fort Loudoun Middle School, a different school within LCSD. (Doc. 67-3, at 964.) Her special-education teacher for seventh grade was Jodi Smith. (*Id.* at 1160.) As in the previous year, M.W.'s Seventh-Grade IEP progress reports do not contain objective test data; they only reflect her teacher's subjective evaluations of her progress, which indicate she made progress on her goals. (*Id.* at 964–92.)

M.W.'s Seventh-Grade IEP required that she participate in a general-education setting, rather than a special-education setting, for ninety minutes per day. (*Id.* at 694.) However, for the first nine weeks of the school year, M.W. only received instruction in her special-education classroom from Smith. (Doc. 67-3, at 1160.) Nevertheless, by November 2019, she was attending science and social-studies classes in the general-education setting with her non-disabled peers. (*Id.*)

On September 18, 2019, the IEP team, including A.W., met to complete a Reevaluation Summary Report[1] for M.W. (*Id.* at 750–64.) Although A.W. had reported M.W.'s recent diagnoses of ODD and intellectual disability to LCSD by at least September 21, 2018, the Reevaluation Summary Report did not include these diagnoses. (*Id.* at 558, 756.) Instead, the Reevaluation Summary Report incorrectly checked "no" next to the question, "in the last three years has there been a change in the student's medical/disability status?" until A.W. corrected the document at the meeting. (*Id.* at 756.) The Reevaluation Summary Report also did not include any AIMSweb testing data from prior to February 2019. (*Id.* at 751–52.) On September 30, 2019, after noticing the missing diagnoses and AIMSweb data at the Reevaluation Summary Report meeting, A.W. filed a due-process complaint with the TDOE alleging that LCSD was refusing to perform M.W.'s eligibility evaluation and correct the Reevaluation Summary Report. (Doc. 67, at 6–8.)

**D.    Procedural History**

*i.    Due-Process Hearing*

On January 2, 2020, A.W. filed an amended due-process complaint, which expanded the allegations against LCSD from merely refusing to reevaluate M.W. to: (1) failure to properly evaluate M.W. for disability-services eligibility; (2) failure to obtain parental written informed consent; (3) failure to properly design, develop and track M.W.'s IEPs; (4) failure to hire properly credentialed teachers and train them; (5) failure to implement M.W.'s IEPs; (6) bad

---

[1] For IDEA-eligible students, an eligibility reevaluation must occur at least every three years "unless the parent and the public agency agree that a reevaluation is unnecessary." 34 C.F.R. § 300.303(b)(2).

faith by LCSD; and (7) deception by LCSD. (*Id.* at 125–37.) These allegations span as far back into M.W.'s education as kindergarten. (*Id.* at 128.)

The administrative proceeding was heard in front of Administrative Law Judge Phillip R. Hilliard over the course of seven days, from June 17–19, 2020, August 17–19, 2020, and August 24, 2020. (Doc. 67-4, at 143.) On the third day of the hearing, June 19, 2020, Plaintiffs identified certain categories of documents that they believed were missing from the production of M.W.'s educational record. (Doc. 67-2, at 1022–25.) Defendants disputed the contention that there were any additional documents that should have been produced pursuant to discovery requests. (*Id.* at 1025–29.) As a result of the dispute, ALJ Hilliard suspended the hearing to allow time for Plaintiffs to identify the categories of documents they believed were missing, LCSD to file any unproduced documents with the administrative court, the parties to state their positions on whether those documents were necessary to respond to the discovery requests, and ALJ Hilliard to determine whether the disputed documents should be admitted into the record. (*Id.* at 1028–36.)

LCSD produced additional documents, including a different version of the Fifth-Grade IEP. (*Compare* Doc. 67-3, at 866–92, *with* Doc. 67-3, at 727–48.) In the initially produced Fifth-Grade IEP (the "First Version"), an "Informed Parental Consent" page appears to be signed by A.W. (Doc. 67-3, at 744.) In the later-produced Fifth-Grade IEP (the "Second Version"), the "Informed Parental Consent" page was blank, containing no signature. (*Id.* at 883.) To reiterate, A.W. testified that she did not attend the September 27, 2017 IEP review meeting. (*Id.*; Doc. 67-2, at 1114–15.) Additionally, on the "IEP Participants" page in the First Version, A.W.'s signature appears, there is a checkmark on "yes" to "in agreement [with the IEP]," and it is dated "9-27-17." (Doc. 67-3, at 743.) On the "IEP Participants" page in the Second Version, A.W.'s

signature appears, but there is no checkmark denoting agreement with the IEP, and it is not dated. (*Id.* at 882.)

After LCSD produced these documents, the due-process hearing resumed on August 17, 2020. (Doc. 67-2, at 430–31.) Plaintiffs sought to introduce the evidence of irregularities in the Informed Parental Consent page and IEP Participants page of the Fifth-Grade IEP when the hearing resumed. (*Id.* at 1103.) LCSD initially objected to the evidence as being outside the four corners of the complaint. (*Id.*) In response, counsel for Plaintiffs explained that the evidence supported the allegations of failure to obtain informed parental consent and use of invalid assessment data. (*Id.* at 1103–06.) ALJ Hilliard then stated, "[Plaintiffs' counsel] has explained the page and paragraph number of the Amended Complaint that he believes shows that this testimony would be within the four corners of the Amended Complaint. Any objection to continuing on that basis; if so, why?" to which counsel for LCSD responded, "No, your Honor," and ALJ Hilliard reiterated, "so there's no remaining objection about whether the documents are within the scope of the Amended Complaint . . . ." (*Id.* at 1106–07.)

After this exchange, the Second Version of the Fifth-Grade IEP was admitted into evidence, and A.W. testified that she did not sign the Fifth-Grade IEP on the IEP Participants page and that she did not believe she was at the September 27, 2017 meeting. (*Id.* at 1114–15.) She also testified that, while the signature on the IEP Participants page "appeared" to be hers, there was no checkmark next to "in agreement" and no date to confirm her attendance, which she would have completed. (*Id.* at 1114–17.) Plaintiffs closed their proof later that day.

LCSD closed their proof on August 19, 2020, with closing arguments to be held on August 24, 2020. (*Id.* at 430–31.) At the outset of the proceedings on August 24, 2020, Plaintiffs moved to reopen proof to allow an expert forensic examination of the original

documents LCSD had produced, and ALJ Hilliard directed them to file a written motion. (*Id.* at 430–31.) ALJ Hilliard ultimately denied the motion, finding that Plaintiffs were not reasonably diligent in seeking this discovery prior to the close of proof when they had both versions of the Fifth-Grade IEP at least as early as July 22, 2020. (*Id.* at 431.) Nonetheless, Plaintiffs maintained that A.W. did not participate in the Fifth-Grade IEP meeting, and in their proposed findings of fact and conclusions of law submitted before the final disposition of the administrative proceeding, they proposed a conclusion of law that LCSD procedurally violated the IDEA by failing to provide A.W. with notice of the meeting, failing to allow A.W. to participate in the meeting, and proceeding with the Fifth-Grade IEP without A.W.'s consent. (Doc. 67-4, at 131.)

### ii.  *Final Order of the Administrative Proceeding*

ALJ Hilliard entered his final order on December 23, 2020. (*Id.* at 201.) ALJ Hilliard concluded that Plaintiffs failed to meet their burden of proof to show that M.W.'s IEPs were not substantively appropriate, thereby denying her a FAPE. (*Id.* at 181.) Plaintiffs' expert, Dr. David Rostetter, Ed.D., had opined that M.W.'s IEPs were insufficient, in part, because LCSD did not determine through its evaluation that M.W. had an intellectual disability under 2016, when she was in fourth grade. (*Id.* at 179.) ALJ Hilliard found that this claim fell outside the two-year statute-of-limitations period, and even if it had not, A.W. knew that she could have requested an Independent Educational Evaluation at LCSD's expense if she saw fit, but she did not. (*Id.* at 179–81.)

ALJ Hilliard also found that Buchanan's teaching M.W. without even a provisional special-education endorsement to his teaching license constituted a procedural violation of the IDEA and that it impeded A.W.'s opportunity to participate in the decision-making process

regarding M.W.'s education, thereby also constituting a substantive violation. (*Id.* at 185.) ALJ Hilliard, however, did not award Plaintiffs any damages because they did not show that Buchanan's lack of proper endorsement resulted *in fact* in a denial of a FAPE. (*Id.* at 185–86.)

He further concluded that Plaintiffs did not show denial of a FAPE through lack of progress, insufficient monitoring or progress, or failure to appropriately modify the IEPs, because there was no proof in the record regarding the progress M.W. *should have* made, the IEPs did not require AIMSweb data tracking for the most part, many other ways were used to measure M.W.'s progress, those methods were not insufficient metrics, and the evidence did not show that the IEPs offered insufficient behavioral interventions. (*Id.* at 186–193.) Finally, ALJ Hilliard concluded the evidence did not support Plaintiffs' claim that the Fifth-Grade IEP and other documents in M.W.'s educational record were inauthentic, nor did it support their contention that LCSD failed to provide sufficient information to allow A.W. to effectively participate in the design of M.W.'s IEP. (*Id.* at 194–99.)

### iii. *Appeal to this Court*

Plaintiffs filed their appeal of that decision in this Court on February 19, 2021. (Doc. 1 in Case No. 3:21-cv-57.)

#### a. Additional Evidence

On September 3, 2021, Plaintiffs moved this Court for limited discovery to retain an expert forensic document examiner, reiterating their concerns regarding the authenticity of certain documents in M.W.'s educational record that they raised in their motion to reopen proof in front of ALJ Hilliard. (Doc. 70.) The Court granted this motion because the IDEA expressly allows parties to present additional evidence, and the Sixth Circuit has taken an expansive view of the scope of additional evidence that may supplement the administrative record, declining to

adopt the narrow position of other circuits that additional evidence is admissible only in limited circumstances.  (Doc. 77, at 5–6 (citing 20 U.S.C. § 1415(i)(2)(C); *Adam Wayne D. ex rel. David D. v. Beechwood Indep. Sch. Dist.*, 482 F. App'x 52, 56 (6th Cir. 2012); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 850 (6th Cir. 2004); *Metro Gov't of Nashville & Davidson Cnty. v. Cook*, 915 F.2d 232, 234 (6th Cir. 1990))).

Accordingly, Plaintiffs retained a forensic document examiner, Emily Will, who testified that the evidence supports the proposition that the Informed Parental Consent page in the First Version of the Fifth-Grade IEP was written by someone other than A.W.  (Doc. 99-1, at 22–25.) Will also testified that there is qualified support[2] for the proposition that the date written by A.W.'s named on the IEP Participants page in the First Version (Doc. 67-3, at 743) was written by someone other than A.W.  (Doc. 99-1, at 27.)  Nevertheless, it is undisputed that A.W. signed, but did not date, the "IEP Participants" page in the First and Second Versions (Doc. 67-3, at 743, 882), and the "Notice of Procedural Safeguards" page in the Second Version (Doc. 67-3, at 884; Doc. 99-1, at 35, 39).

While ALJ Hilliard's finding that Plaintiffs did not prove the Fifth-Grade IEP was inauthentic is owed deference, the Court now has the benefit of the additional, unrebutted expert testimony that A.W. did not sign the Informed Parental Consent page or check in agreement and date the IEP Participants page.  In light of the expert opinion indicating forgery on the Fifth-Grade IEP was likely, A.W. credibly testified that she did not attend the meeting because M.W.'s teacher told her, after she had received the invitation to the meeting, that it would not be held. Her credibility is bolstered by a note she gave to M.W.'s teacher on October 4, 2017, just days

---

[2] Ms. Will testified that it was necessary to qualify this opinion, because the date was a very small amount of writing.  (Doc. 99-1, at 27.)

after LCSD asserts she attended the IEP meeting, which states, "[a]fter reviewing [M.W.'s] IEP plan yesterday, I'm requesting an IEP meeting. It looks like some of [M.W.'s] accommodations are missing. I think I may have been given a draft." (Doc. 67-2, at 402.) A.W. credibly averred that she "would not have requested an IEP meeting on 10/4/17 if [she] had just participated in an IEP meeting 7 days earlier on 9/27/17." (*Id.* at 386.) Further, LCSD cites no testimony to support its contention that A.W. did, in fact, attend the meeting. They only point to A.W.'s signature on the face of the documents, which an unrebutted expert has opined was likely forged. (*See* Doc. 109, at 9–10.) While it is undisputed that the Notice of Procedural Safeguards page was signed and dated by A.W. on September 27, 2017, it is on different letterhead than the rest of the IEP documents—the disputed documents read "IEP Meeting Date: 09/27/2017" at the top of each page, unlike the Notice of Procedural Safeguards page, and it does not otherwise state anything about an "IEP meeting"—and it does not appear to be part of the same "packet" as the Fifth-Grade IEP. (*See* Doc. 67-3, at 866–84.) In light of this evidence, the Court **FINDS** that A.W. did not attend the September 27, 2017 IEP meeting.

    b. <u>Issues on Appeal</u>

    In this appeal, Plaintiffs challenge ALJ Hilliard's conclusions, asserting that LCSD denied M.W. a FAPE by: (1) failing to include A.W. in the September 27, 2017 IEP meeting and forging her signature, (2) failing to develop new goals despite a lack of progress, especially in math, (3) placing M.W. with a teacher who did not have special-education endorsement, (4) failing to provide A.W. with objective progress-monitoring data, and (5) failing to provide M.W. with instruction in the general-education setting. (Doc. 102, at 11–18.) Plaintiffs have filed a motion for judgment on the administrative record (Doc. 102), and their motion is ripe for review.

## II.     STANDARD OF REVIEW

"A district court must give 'modified de novo review' to the administrative officer's finding of facts under the IDEA." *Adam Wayne D.*, 482 F. App'x at 56 (quoting *N.L. ex rel. Mrs. C. v. Knox Cnty. Schs.*, 315 F.3d 688, 692 (6th Cir. 2003)).  The district court:  "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  "Under this standard of review, 'a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.'" *Adam Wayne D.*, 482 F. App'x at 56 (quoting *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)).  To give due weight to the administrative proceedings, district courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review" because courts are "generalists with no expertise in the educational needs of [disabled] students." *Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 463 (6th Cir. 1999) (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989)).

## III.     ANALYSIS

"Under the IDEA, schools that receive federal funds for education must provide every disabled student with a FAPE." *Somberg ex rel. Somberg v. Utica Cmty. Schs.*, 908 F.3d 162, 170 (6th Cir. 2018) (citing 20 U.S.C. § 1412(a)(1)(A)).  To provide a child a FAPE is to provide her adequate special-education services, *i.e.*, specially designed instruction, at no cost to her parents, to meet her unique needs.  20 U.S.C.A. § 1401(9), (29).  "The IEP is 'the centerpiece of

the [IDEA]'s education delivery system for disabled children.'" *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018) (alteration in original) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). To comply with the IDEA's requirement to provide a FAPE, "schools must develop, review, and be prepared to revise an IEP for each such student." *Somberg*, 908 F.3d at 170 (citing 20 U.S.C. § 1412(a)(4)).

"The IEP must (1) comply with the procedures set forth in the IDEA and (2) be 'reasonably calculated to enable the [student] to receive educational benefits.'" *L.H.*, 900 F.3d at 788 (6th Cir. 2018) (alteration in original) (quoting *Rowley*, 458 at 206–07). When reviewing claims under the IDEA, "[f]irst, a court conducts an examination of prior proceedings for procedural compliance, and then an examination of whether the student's substantive rights to services under the IDEA were violated." *N.L.*, 315 F.3d at 693 (citing *Rowley*, 458 U.S. at 206). "Procedural violations generally concern 'the preparation of an IEP.'" *Somberg*, 908 F.3d at 171 (quoting *Rowley*, 458 U.S. at 206). When a complaint alleges a procedural violation, an ALJ may only find the child was denied a FAPE if the procedural violations: "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C § 1415(f)(3)(E)(ii).

"Substantive violations concern the substance of the IEP; namely, whether the school has provided 'an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *L.H.*, 900 F.3d at 789 (internal citations omitted) (quoting *Rowley*, 458 U.S. at 206; *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017)); *see also L.H.*, 900 F.3d at 788–89 ("[T]he process of

providing special education and related services to handicapped children is not guaranteed to produce any particular outcome, and, therefore, the IEP's substantive educational benefits are best measured under the paradigm of appropriate progress based on the unique circumstances of the child for whom it was created.") (alteration in original) (internal quotations and citations omitted). The IDEA is also substantively violated "when a school district materially deviates from a student's IEP." *S.B. ex rel. N.J.B. v. Murfreesboro City Schs.*, No. 3-15-0106, 2016 WL 927441, at \*6 (M.D. Tenn. Mar. 11, 2016) (citing *Holman v. District of Columbia.*, 153 F. Supp. 3d 386, 393 (D.D.C. 2016)). "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id.* (citations omitted). "[T]he proportion of services mandated [in the IEP] to those provided that is the crucial measure for purposes of determining whether there has been a material failure to implement." *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 41 (D.D.C. 2013).

Plaintiffs argue that LCSD denied M.W. a FAPE in her fifth-grade, sixth-grade, and seventh-grade years. (Doc. 102, at 10–18.) They assert IDEA violations for failure to include A.W. in the September 27, 2017 IEP meeting and failure to develop new goals for M.W.'s Fifth-Grade IEP. (*Id.* at 10–13.) As to M.W.'s sixth-grade year, Plaintiffs assert IDEA violations for Buchanan lacking special-education credentials, LCSD failing to provide A.W. with progress-monitoring data, and LCSD failing to address M.W.'s lack of progress in math. (*Id.* at 10–17.) Finally, Plaintiffs assert that while M.W. was in seventh grade, LCSD materially failed to implement her IEP by not providing instruction in the general-education setting for nine weeks and substantively violated the IDEA by continuing to fail to address her math deficits. (*Id.* at 17–18.)

A.    **Fifth Grade**

  i.  *Parent Participation in the September 27, 2017 IEP Meeting*

   a. <u>Statute of Limitations</u>

Plaintiffs contend that A.W. did not attend the September 27, 2017 IEP meeting and that her signature was forged on the Informed Parental Consent page, therefore resulting in the procedural violation of the IDEA by failing to include M.W.'s parent at the meeting and, further, resulting in the denial of a FAPE by "significantly imped[ing] the parent's opportunity to participate in the decision-making process regarding the provision of FAPE." 20 U.S.C § 1415(f)(3)(E)(ii); 20 U.S.C. § 1414(d)(1)(B)(i) (requiring the inclusion of parents on the IEP team); *Honig*, 484 U.S. at 311 ("Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness.") (citations omitted).

  Under the IDEA, the two-year limitations period begins to run when the complainant "knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(C)(3). Plaintiffs concede that the September 27, 2017 meeting occurred outside the IDEA's two-year limitations period, but they contend that they did not know that the Informed Parental Consent page had been forged until their forensic document examiner concluded as much on February 26, 2022, so the two-year statute of limitations should run from that date. (*See* Doc. 104-1, at 4.) The earliest Plaintiffs could be said to have had *reason to know* of the irregularities in the documents was when LCSD first produced those documents in discovery for the administrative proceeding, in 2020. (Doc. 67-2, at 432.) Therefore, the Court finds that this claim is within the statute-of-limitations period for IDEA claims.

b.  Exhaustion

However, "Plaintiffs bringing claims under the IDEA are generally required to exhaust their administrative remedies before bringing a civil action." *Donoho ex rel. Kemp v. Smith Cnty. Bd. of Educ.*, 21 F. App'x 293, 296 (6th Cir. 2001) (citations omitted).  Defendants contend that if Plaintiffs did not know or have reason to know of the inauthenticity of the Fifth-Grade IEP until after the administrative proceeding began, they cannot have exhausted their administrative remedies as to the claim that LCSD denied A.W. participation in the September 27, 2017 IEP meeting.  (Doc. 109, at 8–9.)  Plaintiffs' amended complaint for the administrative proceedings alleges that LCSD failed "to obtain parental written informed consent" in the IEP process and that it engaged in "bad faith" and "deception" for many years.  (Doc. 67, at 127.)  Plaintiffs also alleged that LCSD utilized invalid assessment data.  (*Id.* at 129.)  LCSD's reliance on assessments set forth by an IEP that was prepared without parent participation also falls within Plaintiffs' allegation that LCSD used invalid assessment data.  While they did not raise the specific factual allegation that LCSD held an IEP meeting on September 27, 2017, without A.W. in attendance and forged her signature on the documentation in the amended complaint, the discovery process routinely reveals additional facts to support the allegations.  *See In re Perrine*, No. 18-31333, 2021 WL 3276647, at *8 n.8 (Bankr. E.D. Mich. July 30, 2021) ("The very purpose of discovery is to flesh out facts that are necessary to support or refute a party's claim.").

Further, Plaintiffs raised the issue of suspected inauthenticity of the Fifth-Grade IEP before ALJ Hilliard on August 17, 2020, during A.W.'s testimony.  (Doc. 67-2, at 430–31, 1114–15.)  Plaintiffs introduced the evidence of irregularities in the Informed Parental Consent page, and LCSD withdrew its prior objection to the evidence as being outside the four corners of the complaint.  (*Id.* at 1103–07.)  A.W. testified that she did not sign the Fifth-Grade IEP on the

IEP Participants page, she did not believe she was at the September 27, 2017 meeting, and she would have checked "in agreement" and dated the IEP Participants page if she were in attendance. (*Id.* at 1114–17.) Plaintiffs continued to pursue this claim in the administrative proceeding, moving to reopen discovery proof to retain an expert forensic document examiner. ALJ Hilliard denied the motion, (Doc. 67-2, at 431), but Plaintiffs maintained their claim that A.W. did not participate in the September 27, 2017 IEP meeting in their proposed findings of fact and conclusions of law submitted before the final disposition of the administrative proceeding. (Doc. 67-4, at 131.)

The IDEA's exhaustion requirement exists to enable the agency "to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy." *Donoho*, 21 F. App'x at 296–97 (quoting *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1094 (1st Cir. 1989)). Given the allegations in Plaintiffs' amended complaint, A.W.'s testimony during the administrative proceeding, Plaintiffs' motion to reopen discovery and proof to further support the claim, and Plaintiffs' continued position that A.W. did not participate in the Fifth-Grade IEP meeting, ALJ Hilliard had the opportunity to develop the factual record, apply his expertise, exercise his discretion, and accomplish all of the other goals underlying the IDEA's exhaustion requirement. *See id.* Therefore, the Court finds that Plaintiffs sufficiently exhausted their administrative remedies as to their claim that LCSD failed to allow parent participation in the provision of a FAPE with respect to the Fifth-Grade IEP.

       c.    <u>Procedural and Substantive Violation</u>

The Court has found that A.W. did not attend the September 27, 2017 IEP meeting. *See supra* Section I.D.iii.a. The IDEA requires the parents of the child to be a part of the IEP Team,

and all IEP team members must attend IEP meetings unless the parent and the public agency agree, in writing, that the attendance of a team member is not necessary. 20 U.S.C. § 1414(d)(1)(B)–(C). There is no evidence that A.W. agreed in writing that her attendance at the September 27, 2017 IEP meeting was not necessary. Therefore, LCSD procedurally violated the IDEA by failing to include her at the meeting. *See id.*

"A procedural violation of the IDEA is not a *per se* denial of a FAPE. Rather, a procedural violation will constitute a denial of a FAPE only if it causes substantive harm to the child or his parents; such as seriously infringing on the parents' opportunity to participate in the IEP process, depriving an eligible student of an IEP, or causing the loss of educational opportunity." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 520 (6th Cir. 2003) (internal citation omitted) (citing *Knable*, 238 F.3d at 765 ("[A] school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents.")); 20 U.S.C § 1415(f)(3)(E)(ii). By failing to include A.W. in the September 27, 2017 IEP meeting, the meeting during which M.W.'s Fifth-Grade IEP was prepared, LCSD seriously infringed on A.W.'s ability to participate in the IEP process, thereby constituting substantive harm and a denial of FAPE. Accordingly, the Court **GRANTS IN PART** Plaintiffs' motion for judgment on the administrative record with respect to the fifth-grade parent-participation claim.

ii.    ***Failure to Develop New Goals***

Plaintiffs contend that LCSD violated the IDEA by not revising the goals in M.W.'s IEPs at any point between January 2017 and September 2018. (*See* Doc. 102, at 13.) She worked on the same goals, verbatim, during that twenty-month period, but her progress reports from the same period do not reflect that she met any of the goals. (Doc. 67-3, at 710–13, 733–

36, 919–44; Doc. 97, at 26–29.)  Because Plaintiffs filed their original due-process complaint on September 30, 2019, the IDEA's statute-of-limitations period allows Plaintiffs to proceed with claims that they knew of, or had reason to know of, starting after September 30, 2017. (Doc. 67, at 6–8.)  Even assuming Plaintiffs did not have reason to know that LCSD failed to revise M.W.'s goals in light of inadequate progress until after September 30, 2017, this claim fails.

ALJ Hilliard found that "Petitioners provided no proof of what manner, or type, of progress should have been made by M.W. during the time covered by the statute of limitations, but simply argue that not enough progress was made, primarily relying on the evolution of her educational experience from her kindergarten year through 2016.  This is insufficient to show a denial of FAPE."  (Doc. 67-4, at 187.)  The Court agrees.  Without any evidence of what progress was possible for M.W. to make during this period, or what goals would have been achievable, the Court cannot conclude that LCSD denied her a FAPE by failing to revise her goals.  *See J.B. ex rel. Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018) ("[L]imited academic progress does not *ipso facto* signal a violation of the IDEA . . . .")).  Accordingly, Plaintiffs' motion for judgment on the administrative record is **DENIED IN PART** with respect to this claim.

B.      Sixth Grade

i.      *Buchanan's Special-Education Qualifications*

It is undisputed that Buchanan did not have the appropriate endorsements to serve as M.W.'s special-education teacher and that A.W. was not informed of this fact while Buchanan was teaching, resulting in a procedural violation of the IDEA.  (*See* Doc. 109, 3–5.)  Because of this, ALJ Hilliard found that Plaintiffs "carried their burden of proof to show that Mr. Buchanan

having taught M.W., without the appropriate endorsements, is a procedural violation of the IDEA, and that it significantly impeded parent A.W.'s opportunity to participate in the decision-making process regarding the provision of FAPE to M.W., thereby also constituting a substantive violation of the IDEA." (Doc. 67-4, at 181.) However, ALJ Hilliard also found that Plaintiffs did not carry "their burden of proof to show that Mr. Buchanan having taught M.W. constituted a substantive violation of the IDEA by way of causing a deprivation of educational benefit." (*Id.* at 181–82.) He appears to suggest that claimants are only afforded a remedy for denial of a FAPE when they have shown (1) a procedural violation, (2) a substantive violation, and (3) deprivation of an educational benefit.[3] In fact, the inquiry has only two prongs: "In *Rowley,* the Supreme Court held that an IDEA inquiry is twofold. First, a court conducts an examination of prior proceedings for procedural compliance, and then an examination of whether the student's substantive rights to services under the IDEA were violated." *N.L.*, 315 F.3d at 693 (citing 458 U.S. at 206). In the Sixth Circuit, "a procedural violation will constitute a denial of a FAPE only if it causes substantive harm to the child or his parents; such as seriously infringing on the parents' opportunity to participate in the IEP process, depriving an eligible student of an IEP, *or* causing the loss of educational opportunity." *Berger*, 348 F.3d at 520 (internal citation omitted) (emphasis added) (citing *Knable*, 238 F.3d at 765–66 ("Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process. In addition, procedural violations that deprive an eligible student of an

---

[3] It is unclear in his opinion whether ALJ Hilliard treats "deprivation of an educational benefit" as an additional prong to prove the merits of a denial-of-FAPE claim, or whether it is merely an impediment to Plaintiffs recovering damages or another remedy. (*See* Doc.. 67-4, at 181–86.) To the extent the ALJ grafts this requirement onto the merits of a denial-of-FAPE claim, the Court would overrule his decision; however, to the extent he merely treats it as an impediment to recovering a compensatory-education remedy only, the Court affirms. *See infra* Section IV.

individualized education program or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA.") (internal citations omitted)).

Showing "deprivation of an educational benefit" is not an *additional* prong required to support a FAPE-denial claim, rather, it is one way to satisfy the "substantive harm" prong. *Id.* Therefore, when ALJ Hilliard found that Buchanan's teaching M.W. without the proper endorsements was a procedural violation that "significantly impeded parent A.W.'s opportunity to participate in the decision-making process regarding the provision of FAPE to M.W., thereby also constituting a substantive violation," (Doc. 67-4, at 185–86), the inquiry on the merits of Plaintiffs' claim should have ended, as LCSD was thereby liable for denying M.W. a FAPE. The Court agrees with ALJ Hilliard's finding that Buchanan serving as M.W.'s special-education teacher seriously infringed on A.W.'s opportunity to participate in the IEP process, because LCSD held him out as a credentialed special-education teacher, depriving her of the opportunity to raise the issue of whether Buchanan should provide M.W.'s special-education instruction. (*See* Doc. 67-2, at 552; Doc. 67-3, at 577.) Therefore, the Court **GRANTS IN PART** Plaintiffs' motion for judgment on the administrative record with respect to their claim that Buchanan's lack of proper credentials seriously infringed on A.W.'s opportunity to participate in the IEP process.

### ii. *Failing to Provide A.W. with Progress-Monitoring Data*

Plaintiffs also contend that LCSD violated the IDEA by failing to provide A.W. with objective progress-monitoring data, specifically, the results of AIMSweb probes for her math-problem-solving, math-calculation, and reading-comprehension goals. (Doc. 102, at 15–16.) The IDEA requires that an IEP include, among other items:

> (ii) a statement of measurable annual goals, including academic and functional goals, . . . ;

(iii) a description of how the child's progress toward meeting the annual goals described in subclause (ii) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided.

20 U.S.C. § 1414(d)(1)(A).  M.W.'s Sixth-Grade IEP states that her math-calculation and math-problem-solving goals were to be measured by "data collection, work samples, and monthly progress monitoring," and her reading-comprehension goal would be measured by "data collection, teacher observation, and monthly progress monitoring."  (Doc. 67-3, at 566–67.) Plaintiffs argue that, because of these provisions in the Sixth-Grade IEP, AIMSweb probes should have been administered monthly and the results shared with A.W. in the IEP progress reports, and LCSD's failure to do so significantly impeded A.W.'s opportunity to participate in the decision-making process regarding the provision of FAPE to M.W.  (Doc. 102, at 15.) However, the Sixth-Grade IEP did not specifically require AIMSweb probes to be used as the method for data collection or monthly progress monitoring.  (*See* Doc. 67-3, at 566–67.)  Nor did the IEP or other LCSD policy require AIMSweb probes to be administered monthly; it was merely Stewart's practice when she trained Buchanan and Brown on how to perform the probes. (*See* Doc. 67-2, at 984, 1247, 1253–54.)  Therefore, the Court does not find that LCSD violated the IDEA solely by failing to perform AIMSweb probes monthly.

Beyond some instances in which AIMSweb probes were not administered monthly, there is no evidence that LCSD failed to monitor M.W.'s progress as required in her IEP or share such progress with A.W.  LCSD produced in evidence the various, frequent assessments and in-class work the teachers gave M.W. between November 2018 and May 2019 in reading comprehension, math calculation, math problem-solving, and other areas.  (Doc. 67-3, at 993–1098.)  M.W.'s progress reports all provide detailed comments, based on data collection, teacher

observation, and progress monitoring, stating the status of M.W.'s goal and her progress since the last report, and these comments are substantiated by the assessments and in-class work LCSD produced. (*See id.*; Doc. 67-3, at 946–62.) For example, M.W.'s first progress report states, regarding her math-calculation goal, that M.W. "is still working on regrouping and borrowing with subtraction problems, but has shown growth and mastered addition with the use of a number line." (Doc. 67-3, at 947.) Additionally, her final Sixth-Grade IEP progress report states regarding her math problem-solving goal that M.W. "had been able to do a few one step math word problems at a second grade level, and during the month of May she has been able to demonstrate she can do two step math problems at the same level, as long as the teacher reads the problems." (*Id.* at 960.) These comments reflect that the progress reports kept A.W. appropriately apprised of M.W.'s progress and that M.W.'s teachers were tracking her progress with data collection, observation, and monitoring. Further, Plaintiffs present no evidence that LCSD failed to utilize any method *required by her IEP* to track her progress—they only point to some missing AIMSweb data. Significantly, if M.W.'s teachers had only based their assessments of M.W.'s progress on the AIMSweb data, they would not have been complying with the IEP, because, as Dr. McCook testified, "AIMSweb is an observational one piece of data that is one minute out of the 7,200 minutes that month that the child has instruction," and "typically . . . it would not be best practice to use one piece of data to make a determination of progress monitoring." (Doc. 67-3, at 330–31.)

Plaintiffs point to M.W.'s regression on the WJ-III NU Ach Math-Calculation subtest from a 1.9 grade-level equivalent in September 2018 to a "<K.2" equivalent in March 2019 as evidence that M.W.'s progress was not adequately monitored. (Doc. 67-3, at 678.) However, "[l]imited academic progress does not *ipso facto* signal a violation of the IDEA," and Plaintiffs

present no evidence regarding what type of progress M.W. should have made on the WJ-III NU

Ach Math-Calculation subtest. *See J.B.*, 325 F.Supp.3d at 9. The Court also credits and defers

to ALJ Hilliard's conclusion, given his expertise in education, that, because of M.W.'s

disabilities, the AIMSweb probes and Woodcock-Johnson tests could not accurately reflect her

progress:

> Dr. McCook credibly testified that M.W., due to her disabilities, has not
> developed "automaticity" in math – the ability to simply know and remember, for
> example, that 2+2=4. Instead, M.W. has to add the numbers together. This
> inhibits her ability to do multi-step problems, or to solve problems in a timed
> setting, such as on Aimsweb probes. He further testified that the lack of
> automaticity will likely cause M.W. to continue to fall further behind as time
> progresses and the content becomes more difficult. Additionally, Dr. McCook
> credibly testified that, as with any person, because math is not her strong suit,
> M.W. appears to avoid working most diligently in that area. Moreover, Dr.
> McCook credibly testified that due to M.W.'s ADHD, not unexpectedly, she has
> difficulty paying attention and following multi-step directions. Similar to math,
> not performing well with multi-step directions may result in less motivation to
> participate in learning that requires that discipline. This is not to say that the
> Respondent does not have the obligation to continue to help M.W. overcome
> these hurdles, but it does inform the discussion about what expectations should
> be, in terms of progress. Therefore, the Petitioners failed to meet their burden of
> proof to show M.W.'s progress, during the time captured by the statute of
> limitations, constituted a FAPE violation.

(Doc. 67-4, at 188.) In light of the evidence that LCSD complied with the progress-monitoring

requirements in M.W.'s Sixth-Grade IEP, the Court finds no violation of the IDEA on this basis.

Therefore, Plaintiffs' motion for judgment on the administrative record (Doc. 102) is **DENIED**

**IN PART** as to this claim.

### iii. *Failure to Address M.W.'s Deficits in Math Calculation*

Plaintiffs also contend that M.W.'s lack of progress on AIMSweb probes and the WJ-III

NU Ach Math-Calculation subtest should have resulted in LCSD changing M.W.'s math goals

and instruction and/or addressing M.W.'s opposition to math through behavior goals. (Doc. 102,

at 16–17.) This claim fails for the same reason that Plaintiffs' fifth-grade claim for failure to

develop new goals changed—they provided no proof regarding what kind of progress M.W. should have made, or how different goals would have been more reasonably calculated to enable M.W. to make progress appropriate in light of her circumstances. (*See* Doc. 67-4, at 187.) The only evidence Plaintiffs rely on to support this claim is M.W.'s regression on AIMSweb probes and the WJ-III NU Ach Math-Calculation subtest, which, as the Court previously discussed, have limited value in actually assessing M.W.'s abilities and progress due to her disabilities' impact with respect to timed testing. Additionally, her regression on these tests is credibly rebutted by her sixth-grade student work and her teachers' assessments of her progress. (*See* Doc. 67-3, at 946–62, 993–1098.) As ALJ Hilliard found, the Court also finds that the evidence supports that M.W. did, in fact, make appropriate progress toward her goals. (*See* Doc. 67-4, at 189–90.) Accordingly, Plaintiffs' motion for judgment on the administrative record is **DENIED IN PART** with respect to this claim.

### C.      Seventh Grade

Finally, Plaintiffs contend that LCSD denied M.W. a FAPE during her seventh-grade year because, for the first nine weeks of school, she did not attend classes in the general-education setting as required by her IEP, and LCSD continued to fail to address M.W.'s deficits in math calculation. (Doc. 102, at 17.) While ALJ Hilliard heard some evidence relating to M.W.'s seventh-grade year, Plaintiffs did not raise the issue regarding M.W.'s attendance in the general-education setting in the administrative proceeding at all. (*See* Doc. 67, at 125–37; Doc. 67-4, at 143–99.) Therefore, Plaintiffs have not exhausted their administrative remedies as to this claim, and their motion for judgment on the administrative record (Doc. 102) is **DENIED IN PART** on that basis. Plaintiffs' claim regarding the continued failure to address M.W.'s deficits in math calculation in seventh grade fails for the same reasons the Court found this claim failed

as to M.W.'s sixth-grade year. *See supra* Section III.B.iii. Therefore, Plaintiffs' motion for judgment on the administrative record (Doc. 102) is also **DENIED IN PART** as to the seventh-grade math-calculation-deficits claim.

## IV. REMEDIES

If a district court determines that a school district has violated the IDEA by denying the student in question a FAPE, then the court shall "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). In so doing, the court has broad discretion. *Knable*, 238 F.3d at 770. "An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate." *Bd. of Educ. of Fayette Cnty., Ky. v. L.M. ex rel. T.D.*, 478 F.3d 307, 316 (6th Cir. 2007) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)). "Compensatory education is '[a] judgment that simply reimburses a parent for the cost of obtaining educational services that ought to have been provided free.'" *Somberg*, 908 F.3d at 171 (alteration in original) (quoting *Hall v. Knott Cnty. Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir. 1991)).

Plaintiffs seek the remedy of compensatory education. (Doc. 102, at 17–18.) LCSD contends that the remedies awarded by ALJ Hilliard—ordering LCSD to provide adequate training to district and school personnel regarding TDOE's requirements for special-education teachers and to create a checklist of applicable TDOE requirements to be reviewed and signed by personnel responsible for new hires—was the appropriate remedy. (Doc. 109, at 17–18.)

The Court has found LCSD liable for denying M.W. a FAPE because LCSD did not include A.W. at the September 27, 2017 IEP meeting and because Buchanan did not have a special-education endorsement on his teaching license when he served as M.W.'s special-education teacher. *See supra* Section III. However, Plaintiffs have not advanced any evidence to

show that these violations deprived M.W. of some educational benefit that she could now obtain through compensatory education. Buchanan met all the substantive requirements of having a provisional special-education endorsement to his teaching license. (Doc. 67-2, at 550–52; 628.) Plaintiffs made no showing that if Buchanan had submitted the letter from his graduate program to TDOE to complete the paperwork required for his special-education endorsement, and been properly credentialed, that the quality of educational services M.W. received would have changed.

Plaintiffs also made no showing that including A.W. in the September 27, 2017 IEP meeting would have changed the educational services M.W. received. In fact, on November 16, 2017, LCSD held another IEP meeting that A.W. did attend, and she signed off on the Fifth-Grade IEP Addendum which included the exact same goals as the Fifth-Grade IEP. (Doc. 97, at 26–32.) The only difference was the specification of certain additional accommodations to be provided to M.W. in her classes. (*Id.*; Doc. 67-3, at 733–36.) M.W. was operating under an IEP that A.W. did not participate in creating for less than two months, and once A.W. was able to participate, there was no change to the substantive instruction and educational benefit A.W. was to receive. Therefore, the Court cannot find on either of Plaintiffs' meritorious denial-of-FAPE claims that M.W. was deprived of an educational benefit such that compensatory education would be an appropriate remedy. Accordingly, the remedy awarded by ALJ Hilliard (*see* Doc. 67-4, 200–01) is **AFFIRMED**. Plaintiffs seek attorneys' fees and costs for litigating this action but no other alternative remedy to compensatory education. (Doc. 102, at 17–18; Doc. 111, at 5.) Plaintiffs **SHALL** file a post-judgment motion for attorneys' fees and costs. *See Tompkins ex rel. A.T. v. Troy Sch. Dist.*, 199 F. App'x 463, 466 (6th Cir. 2006) ("[F]or the Parents to be eligible for an award of attorneys' fees as 'prevailing parties' under the IDEA, they must have

(1) succeeded on a significant issue, and (2) this success must be *embodied in* [] *a judgment* on the merits . . . .") (emphasis added).

## V.   CONCLUSION

For these reasons, Plaintiffs' motion for judgment on the administrative record (Doc. 102) is **GRANTED IN PART** and **DENIED IN PART**.  ALJ Hilliard's decision is **OVERRULED** to the extent it found no denial-of-FAPE liability regarding LCSD's failure to include A.W. in the September 27, 2017 IEP meeting and Buchanan lacking special-education credentials.  ALJ Hilliard's decision is **AFFIRMED** to the extent it found no liability for Plaintiffs' remaining claims and as to the remedy it awarded Plaintiffs.

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

*/s/Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**